UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SCOTT THOMAS MCMANUS,

                    Plaintiff,

        -against-                                    1:16-CV-894 (LEK/DJS)

TETRA TECH CONSTRUCTION, INC.,
*et al.*,

                    Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Scott McManus commenced this action against defendants Tetra Tech

Construction, Inc. and Tetra Tech, Inc. (collectively, "Tetra Tech") on July 19, 2016, alleging

unlawful retaliation in violation of the employee-protection provisions of the Dodd-Frank Wall

Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6. Dkt. No. 1

("Complaint"). On September 27, 2016, Tetra Tech moved to dismiss the Complaint. Dkt.

Nos. 17 ("Motion"), 17-1 ("Memorandum"), 17-2 ("Request for Judicial Notice"). McManus

opposed the motion on October 18, 2016, Dkt. No. 19 ("Opposition"), and Tetra Tech filed its

reply on October 24, 2016, Dkt. No. 20 ("Reply"). On November 22, 2016, McManus moved for

leave to file an amended complaint. Dkt. Nos. 21 ("Motion to Amend"), 21-1 ("McManus's

Memorandum"), 21-2 ("Redline Proposed Amended Complaint"), 21-3 ("PAC") 21-4

("Proposed Order"). Tetra Tech opposed McManus's motion on December 19, 2016. Dkt. No. 22

("Tetra Tech's Opposition"). For the reasons stated below, Tetra Tech's motion to dismiss is

denied, and McManus's motion to amend is granted.[1]

## II.    BACKGROUND[2]

McManus began working for Delaney Construction, Inc. in 2000. PAC ¶ 29. In 2007,

Tetra Tech, Inc. acquired Delaney Construction, and renamed it Tetra Tech Construction. Id.

¶ 30. Tetra Tech, Inc. is a publicly traded company holding classes of securities registered under

Section 12 of the Securities Exchange Act of 1935, 15 U.S.C. § 78o(d), and required to file

reports under Section 15(d) of the Exchange Act. Id. ¶ 22. The company provides "consulting,

engineering, program management, construction management, and technical services to both

government and private sector clients." Id. ¶ 28. Presently, Tetra Tech Construction is managed

under Tetra Tech's Remediation and Construction Management ("RCM") business group, and

headquartered in Gloversville, New York. Id. ¶¶ 25, 27.

After it acquired Delaney Construction in 2007, Tetra Tech named McManus Director of

Business Development in the company's Gloversville, New York–based wind power division. Id.

¶¶ 30–36. In 2014, Tetra Tech invited McManus to join approximately twenty-five other

employees in the company's leadership program. Id. ¶ 39. Tetra Tech organized quarterly three-

---

[1]  McManus filed his Motion to Amend after the parties had fully briefed Tetra Tech's Motion. Dkt. No. 21. Because Tetra Tech opposed McManus's Motion on futility grounds, arguing that the PAC did not remedy the purported deficiencies of the Complaint, Tetra Tech's Opp'n at 1, the Court will consider Tetra Tech's arguments in light of the PAC.

[2]  Because this case is before the Court on a motion to dismiss for failure to state a claim, the allegations of the PAC are accepted as true and form the basis of this section. E.g., Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor").

day conferences for leadership program participants and senior management. Id. ¶ 40. At the first leadership conference he attended during the first quarter of 2014, McManus explained during a group conversation "that, based on his own observations of the company's culture, leaders of business units made decisions which focused more on those leaders' personal financial interests than upon the interests of shareholders." Id. ¶ 46. Specifically, McManus noted that the company's "bonus structure and the way the company executed it served to incentivize business unit leaders to falsify numbers in order to ensure bonuses." Id. ¶ 47. During a subsequent discussion, McManus stated that he believed that Tetra Tech Construction's cost accounting process "was not effective" and that he "was concerned that Tetra Tech frequently changed systems in an effort to conceal its failure to adequately and timely report losses." Id. ¶¶ 50, 54.

On or about July 17, 2014, McManus attended a meeting at RCM's Houston, Texas office with several RCM officials, Executive Vice President Frank Gross, Vice President Larry Brown, and Human Resources Director Patti Holcomb. Id. ¶ 56. The RCM officials told McManus that Tetra Tech planned to close its transportation unit in Gloversville, but that it would maintain the wind energy unit where McManus worked. Id. ¶ 57. The Gloversville unit would eventually be merged with Tetra Tech's Major Project Execution ("MPE") unit and moved to Houston. Id. Gross informed McManus that he would form part of the new MPE unit's three-person management team and be relocated to Houston. Id. ¶¶ 58, 60. The restructuring plan was revealed to other Tetra Tech employees later that day. Id. ¶ 59. Also in July 2014, Executive Vice President of Water, Environment, & Infrastructure Leslie Shoemaker separately informed McManus that he would be retained after the restructuring. Id. ¶ 60. During the summer of 2014,

Tetra Tech announced several different restructuring plans,[3] eventually merging the energy group with RME. Id. ¶ 81.

McManus had a second meeting with Gross on July 21, 2014. Id. ¶ 61. At this meeting, McManus raised concerns that Tetra Tech's accounting practices did not comply with federal securities laws. Id. ¶¶ 62–75. Specifically, McManus told Gross that he did not believe that Tetra Tech "accurately accounted for losses on projects" and that it "[took] steps to conceal [its] losses until it became convenient for Tetra Tech to report them." Id. ¶ 65. McManus explained that "nearly all" of the major projects he had worked on at Tetra Tech had become unprofitable prior to completion, but that "Tetra Tech falsified profits by reporting inflated Operating Income/Revenue Growth to impact share price and share metrics." Id. ¶¶ 67, 69. Essentially, McManus reported, the company delayed reporting losses until it reported "the initial high profitability of new projects to offset [those] losses." Id. ¶ 71. McManus told Gross that he believed this conduct violated the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.* Id. ¶ 62.

On October 7, 2014, McManus sent an e-mail to Gross and Tetra Tech's human resources director, Bill Marine, detailing his concerns that Tetra Tech's accounting practices violated federal securities laws. Id. ¶¶ 83–85. In his e-mail, McManus stated the following:

> I am inquiring on our accounting on projects (lack thereof) and overall financial reporting as they relate to the SOX [Sarbanes-Oxley] act, which relates to SEC compliance of the organization. I would like

---

[3] McManus's description of these various plans is somewhat unclear. This is partially due to the fact that the PAC uses a several similar terms to describe the business units of Tetra Tech's Gloversville office. McManus refers to the former Gloversville facility as "the entire division," containing transportation and energy groups. PAC ¶ 79. But he also references an "energy division," id. ¶¶ 80, 81, and a "wind energy division," id. ¶ 57. It is not clear whether the "energy division" is separate from the "wind energy division," and whether either contains the "energy group."

> to understand the process more and discuss the areas where I feel we
> are not in compliance. This has been a concern of myself and others
> for some time and I am dissatisfied with the lack of attention it has
> received. The decision has been made to sell TCI and in turn report
> the organization as a discontinued operation—I am afraid this is the
> final attempt to cover up the officers of this company's lack of
> SEC/SOX compliance and negligent handling of the organization's
> business reporting.

Id. ¶ 84.

McManus learned of these accounting issues through his experiences managing projects, as well as discussions with high-ranking Tetra Tech officials and accounting personnel. Id. ¶¶ 67, 86, 93. According to one vice president McManus spoke to, the company had lost approximately $35 million on several projects. Id. ¶ 87. When these losses were reported internally, the president of Tetra Tech Construction at the time stated that "the losses were much higher than what he wished to report." Id. ¶ 90. The company ultimately "reported the losses much later than when they actually were aware that the losses would occur." Id. ¶ 91. McManus heard similar concerns about the same project from the company's estimators who were "assigned to perform analyses on the financial future of the project." Id. ¶ 93. On one occasion, the former president of Tetra Tech Construction instructed estimators who had raised concerns about losses "not to concern themselves with anything to do with the project, including discussion of incurred losses." Id. ¶ 94. McManus identified several other projects where reporting of "significant losses" was delayed beyond what the estimators believed to be appropriate. Id. ¶¶ 96–97. Based on his knowledge of these projects, McManus "believed there was likely to be a company-wide pattern of delaying the reporting of actual costs and refusing to report other actual costs, which would serve to inflate [Tetra Tech's] appearance of profitability and subsequently [its] stock

price." Id. ¶ 102. These delays created "a windfall for company executives in timing their exercises of stock options or earn-out bonuses." Id. ¶ 104.

Within an hour of sending the October 7 email to Gross and Marine, McManus received a phone call from Shoemaker and Senior Vice President of Corporate Human Resources Kevin McDonald. Id. ¶ 107. On the call, Shoemaker and McDonald told McManus that he "had no future" at Tetra Tech and withdrew his invitation to the upcoming leadership program conference. Id. ¶ 108. The next day, McManus received a phone call from Tetra Tech's Chief Executive Officer, Dan Batrack, and its Chief Financial Officer, Steven Burdick, apologizing for the October 7 phone call and assuring McManus that he had a future at the company. Id. ¶¶ 112–113. McManus reiterated the Sarbanes-Oxley concerns he had raised with Gross and Marine the prior day, which Burdick agreed to discuss. Id. ¶¶ 115, 117.

On January 27, 2015, Steve Ruffing, who was overseeing the wind-down of Tetra Tech Construction, notified McManus that he would be terminated the following week. Id. ¶ 127. During this conversation, McManus asked Ruffing about a project bonus McManus had been promised, but not received. Id. ¶ 131. Later that day, McManus received a bonus that was about half the size he had been promised. Id. ¶ 132. When McManus asked Ruffing about the reduced bonus, Ruffing told him that Tetra Tech had intended to fire him "a while ago" in the fall of 2014. Id. ¶ 133.

The same day, McManus notified Ruffing of his concerns regarding Tetra Tech's accounting irregularities and potential securities law violations. Id. ¶ 134. He also sent an additional email to senior management describing his concerns that the company had violated Sarbanes-Oxley and that he had only received half of the bonus he was owed. Id. ¶¶ 135–36.

McManus was not terminated the following week. He continued to work on wind-down projects until his termination was finalized on March 18, 2015. Id. ¶¶ 137–43. Like McManus, several leadership program participants were promised positions within the restructured entity. Id. ¶ 149. None of these employees complained about Tetra Tech's compliance with Sarbanes-Oxley, and none were terminated. Id. ¶¶ 150, 164. In fact, McManus was the only member of Tetra Tech's leadership program terminated in connection with the restructuring. Id. ¶¶ 144–45.

## III.  LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the possibility of misconduct based on the pleaded facts, the pleader has not demonstrated that he is entitled to relief, and the action is subject to dismissal. Id. at 678–79. Nevertheless, "[f]act-specific question[s] cannot be resolved on the pleadings." Anderson News,

L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (second alteration in original)

(quoting Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001)). Presented with "two plausible

inferences that may be drawn from factual allegations," a court "may not properly dismiss a

complaint that states a plausible version of the events merely because the court finds a different

version more plausible." Id.

## IV.    DISCUSSION

The whistleblower protection provision of Dodd-Frank provides:

> No employer may discharge, demote, suspend, threaten, harass,
> directly or indirectly, or in any other manner discriminate against, a
> whistleblower in the terms and conditions of employment because of
> any lawful act done by the whistleblower—
>
> (i) in providing information to the Commission in accordance with
> this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or
> judicial or administrative action of the Commission based upon or
> related to such information; or
>
> (iii) in making disclosures that are required or protected under the
> Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter,
> including section 78j-1(m) of this title, section 1513(e) of Title 18,
> and any other law, rule, or regulation subject to the jurisdiction of the
> Commission.

15 U.S.C. § 78u-6(h)(1)(A). To survive a motion to dismiss a Dodd-Frank retaliation claim, a

plaintiff must plausibly allege that: (1) the employee engaged in a protected activity, (2) the

employee suffered an adverse employment action, and (3) the adverse action was causally

connected to the protected activity. Ott v. Fred Alger Mgmt., Inc., No. 11-CV-4418, 2012 WL

4767200, at *4 (S.D.N.Y. Sept. 27, 2012).

Tetra Tech advances three arguments why the Complaint should be dismissed and McManus's Motion to Amend should be denied. First, Tetra Tech argues that McManus fails to plausibly plead that his termination was caused by his alleged protected activity. Mem. at 2, 4–7; Tetra Tech's Opp'n at 3–5. Second, Tetra Tech asserts that McManus's belief that Tetra Tech committed accounting fraud is objectively unreasonable. Mem. at 3, 8–16; Tetra Tech's Opp'n at 5–14. Third, Tetra Tech claims that McManus does not qualify as a "whistleblower" under § 78u-6(h) because he did not report his concerns to the Securities and Exchange Commission ("SEC"). Mem. at 4, 16–19.[4] For the reasons discussed below, each of Tetra Tech's arguments is unavailing.

## A. Causation

Tetra Tech argues that "the only fair reading of the Complaint is that McManus . . . was swept up in an office and divisional closure that was announced prior to any of McManus's alleged protected activity." Id. at 4. McManus counters that he was "promised a future, even in light of a potential reorganization, [but] suffered a termination **after** his protected activity." Opp'n at 7.

As Tetra Tech correctly notes, McManus learned that the Gloversville facility would be closed before he raised his Sarbanes-Oxley concerns. Mem. at 6. But Tetra Tech makes too much of this fact. McManus does not simply claim that he was terminated when his facility was closed due to restructuring. Instead, he alleges that he was told he would be relocated to Houston to help

---

[4] As Tetra Tech notes, Mem. at 4, the Second Circuit rejected this argument in Berman v. Neo@Ogilvy LLC, 801 F.3d 145 (2d Cir. 2015), which held that an employee need not report to the SEC to qualify as a "whistleblower" under § 78u-6(h), id. at 155. This Court is bound by Berman, and therefore rejects Tetra Tech's argument that McManus was required to report his concerns to the SEC to fall under Dodd-Frank's whistleblower provision.

manage the restructured wind power unit following the Gloversville closure, PAC ¶¶ 56–60, but was terminated after reporting potential Sarbanes-Oxley violations, id. ¶¶ 102–08, 143. Not until October 7, 2014, when McManus emailed Gross and Tetra Tech's human resources director to express concerns that Tetra Tech's accounting practices violated federal securities laws, did McManus have reason to doubt that he would be retained following the restructuring. Id. ¶¶ 83–85, 108. Within an hour of sending this email, McManus received a phone call from a two Tetra Tech vice presidents notifying him that he "had no future in the organization" and withdrawing his invitation to the upcoming leadership program conference. Id. ¶¶ 107–08. On January 27, 2015, McManus was told that he would be terminated the following week, and received a bonus that was about half the size he had been promised. Id. ¶¶ 127, 131. The same day, McManus learned from his supervisor that Tetra Tech had intended to fire him "a while ago" in the fall of 2014. Id. ¶ 133. McManus was terminated on March 18, 2015. Id. ¶ 143. Contrary to Tetra Tech's argument, the adverse employment act did not occur in July 2014 when McManus learned the Gloversville office would close, but when he was dismissed instead of relocated to Houston as promised. Tetra Tech does not address this critical allegation, and the cases it cites are inapposite.

Tetra Tech relies on Hunt v. Central Consolidated School District, 951 F. Supp. 2d 1136 (D.N.M. 2013), to argue that McManus fails to plausibly allege causation because the "allegedly protected activities followed his receiving notice that his entire office would be closed." Mem. at 6. In Hunt, the district court held that the plaintiff had not plausibly alleged a Title VII retaliation claim because the alleged retaliatory act occurred several months before the protected activity. 951 F. Supp. 2d at 1216–17. As a result, the complaint did "not make plausible that 'a

causal connection existed between the protected activity and the materially adverse action.'" Id. at 1216 (quoting Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)). Had Tetra Tech not told McManus that he would be retained and relocated to Texas after the closing of the Gloversville facility, Hunt might support dismissal here. But the case does not help Tetra Tech overcome the allegation that McManus was pushed out of the company after receiving assurances that he would be retained and after reporting improper accounting activities.

The same is true of McCalman v. Partners in Care, No. 01-CV-5844, 2003 WL 22251334 (S.D.N.Y. Sept. 30, 2003), which Tetra Tech cites for the same proposition. Mem. at 6. In McCalman, the court dismissed a retaliation claim after determining that the plaintiff "could not have been fired in *response* to the filing of her EEOC complaint since she first approached the EEOC *after* she was fired." 2003 WL 22251334, at *7. McCalman is distinguishable because, as noted above, McManus alleges that the adverse employment action occurred several months after his protected activity.[5]

Temporal proximity further strengthens the causal connection between McManus's reporting and termination. A "plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001) (alteration in original) (quoting Reed v.

---

[5] Tetra Tech also relies on Dennis v. United Parcel Service Inc., No. 07-CV-9754, 2008 WL 4945634 (S.D.N.Y. Nov. 20, 2008), to argue that "McManus pleads himself out of a case." Tetra Tech's Opp'n at 4. But in that case, the plaintiff admitted to misconduct in his complaint, which provided an alternative non-discriminatory reason for termination. Id. at *5. Additionally, both the New York Human Rights Division and a neutral arbitrator had previously determined that his termination was justified. Id. No such facts exist here.

A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). The Second Circuit has "declined to draw a 'bright line' defining the outer limits beyond which causation based on temporal proximity may be established." Bierce v. Town of Fishkill, 656 F. App'x 550, 552 (2d Cir. 2016) (citing Gorman-Bakos, 252 F.3d at 554). But the fact that McManus received a phone call explaining that "there was no place" for him at Tetra Tech just one hour after raising Sarbanes-Oxley concerns, PAC at ¶¶ 107–08, and that he was terminated approximately five months later, id. at ¶ 143, certainly supports an inference of causation at the motion-to-dismiss stage, see Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causation where six months passed between protected act and alleged retaliatory actions); Gorman-Bakos, 252 F.3d at 555 (same based on a five-month period).

Contrary to Tetra Tech's contention, McManus does not merely "rel[y] on conclusions and state[] no facts that could demonstrate pretext or retalitatory animus." Mem. at 7 (citing Brady v. United States Capitol Police, 200 F. Supp. 3d 208, 214 n.3 (D.D.C. 2016)). McManus's allegation that he was told he would be retained when his office was closed, PAC ¶¶ 58–60, but then disinvited from the leadership conference and ultimately terminated after reporting potential Sarbanes-Oxley violations, id. ¶¶ 107–08, is more than a "conclusory allegation that [Tetra Tech's] explanation is pretext," Brady, 200 F. Supp. 3d at 214 n.3. A well-pleaded complaint need not contain "detailed factual allegations" to satisfy Rule 8. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). McManus's allegations, which the Court accepts as true for the purposes of Tetra Tech's Motion, plausibly suggest causation and certainly represent "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

## B. Reasonable Belief

To state a claim under § 78u-6, a plaintiff must plausibly allege that he had an objectively reasonable belief that the defendant's conduct violated the securities laws. Berman v. Neo@Ogilvy LLC, No. 14-CV-523, 2016 WL 7975001, at *7 (S.D.N.Y. Oct. 24, 2016). A plaintiff "must show not only that he believed that the conduct constituted a violation" of the covered laws, "but also that a reasonable person in his position would have believed that the conduct constituted a violation." Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221 (2d Cir. 2014). "The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'" Id. (quoting Sharkey v. J.P. Morgan Chase & Co., 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011)). "As the inquiry focuses on the reasonableness of the employee's belief, the conduct about which the employee provides information need not have actually violated an enumerated provision." Ashmore v. CGI Grp., Inc., 138 F. Supp. 3d 329, 341 (S.D.N.Y. 2015) (citing Guyden v. Aetna, Inc., 544 F.3d 376, 384 (2d Cir. 2008)). Nor must the employee "communicate to the employer which laws the employer's conduct allegedly violated"; he "need only 'identify the specific *conduct* that the employee believes to be illegal.'" Yang v. Navigators Grp., Inc., 18 F. Supp. 3d 519, 529 (S.D.N.Y. 2014) (quoting Ashmore v. CGI Grp., Inc., No. 11-CV-8611, 2012 WL 2148899, at *6 (S.D.N.Y. June 12, 2012)). Assessing "whether a plaintiff's belief was objectively reasonable is a mixed question of law and fact, meaning that it should be decided by the Court only if there is no genuine issue of material fact as to the belief's reasonableness.'" Berman, 2016 WL 7975001, at *6 (quoting Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 444 (S.D.N.Y. 2013)).

Tetra Tech argues that McManus fails to meet the objective reasonableness standard articulated in Nielsen because he improperly presents legal conclusions as facts. Mem. at 9. This, Tetra Tech asserts, is "exactly the scenario presented in Twombly and Iqbal." Id. In Twombly, the Supreme Court noted that in deciding a motion to dismiss, a court need not assume the truth of allegations that are "merely legal conclusions." 550 U.S. at 564–65. The Twombly respondents' charge that the petitioners had "entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another" was simply a "formulaic recitation of the elements of a cause of action" and thus not entitled to an assumption of truthfulness. Id. (alteration in original). Similarly, in Iqbal, the Court determined that the respondent's allegation that "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'" was not entitled to an assumption of truth because it was a legal conclusion, not a factual allegation. 556 U.S. at 680–81. Tetra Tech urges this Court to view McManus's claims as similarly formalistic recitations. Mem. at 9–10; Tetra Tech Opp'n at 10.

McManus's alleged belief is not a mere "recitation of the elements of" securities fraud. Twombly, 550 U.S. at 555. In the PAC, McManus essentially alleges that he believed Tetra Tech's accounting practices violated Sarbanes-Oxley. Specifically, he "believed there was likely to be a company-wide pattern of delaying the reporting of [project] costs and refusing to report other actual costs, which would serve to inflate [Tetra Tech's] appearance of profitability and subsequently [its] stock price." PAC ¶ 102. These delays created "a windfall for company executives in timing their exercises of stock options or earn-out bonuses." Id. ¶ 104. Although he

is not an accountant and does not allege any special knowledge of federal securities law,
McManus based his beliefs on his experience and conversations with other Tetra Tech
employees. His job included tracking project costs, id. ¶ 36, and he had experience reviewing and
approving project contracts, id. ¶ 30. Additionally, McManus gained knowledge of Tetra Tech's
accounting issues through discussions with high-ranking Tetra Tech officials and accounting
personnel. Id. ¶¶ 86, 93. Several of the company's accounting estimators informed McManus that
the reporting of "significant losses" had been delayed beyond what the estimators believed to be
appropriate. Id. ¶¶ 93–96. McManus does not simply "tick[] off the elements of a securities fraud
violation," Mem. at 10; he has identified specific projects he believed were overstated and
provides a plausible basis for his knowledge.

McManus's allegations are consistent with those deemed plausible by courts in this
circuit, and therefore the Court finds he has adequately "nudged [his] claims . . . across the line
from conceivable to plausible." Iqbal, 556 U.S. at 680 (first alteration in original) (quoting
Twombly, 550 U.S. at 570). In Berman, the court held that the plaintiff's allegations that he
believed the defendant's accounting practices "tainted and misrepresented the consolidated
financial statements," "violated [Sarbanes-Oxley]," and "constituted a material audit weakness"
adequately pled violations for purposes of a motion to dismiss. 2016 WL 7975001, at *10. The
violations alleged by McManus are substantially similar to those deemed objectively reasonable
in Berman.

Similarly, in Wiggins v. ING U.S., Inc., No. 14-CV-1089, 2015 WL 8779559 (D. Conn.
Dec. 15, 2015), the plaintiff alleged that she "believed that [defendants'] persistent determination
of incorrect [market value assessments] violated federal securities laws because she knew that

federal securities laws required [d]efendants to maintain accurate books and records, establish adequate internal controls to ensure accurate reporting of financial information, and to act in the best interests of clients in accordance with fiduciary duty obligations." Id. at *6. The court held that such allegations adequately stated a claim and were "not so vague or conclusory as to render [the complaint] deficient for lack of 'tethering.'" Id. Like Berman, these allegations are akin to those brought by McManus.

Courts outside this circuit have likewise held that allegations similar to McManus's satisfy the reasonable belief standard. In Wood v. Dow Chemical Company, 72 F. Supp. 3d 777 (E.D. Mich. 2014), the court held that the plaintiff had an objectively reasonable belief that defendant violated the securities laws when she expressed concerns regarding improper reimbursements for personal expenses and the improper accounting of $3.8 million to "hide cost overruns" on a particular project. Id. at 788–89. The court held that "[a] reasonably objective individual would not describe such discrepancies as trivial and could believe those practices to be inconsistent with shareholder interests." Id. at 789.

This case is distinguishable from those where courts have rejected plaintiffs' allegations as unduly speculative. In Nielson, the plaintiff, a fire engineering manager whose responsibilities included ensuring that company engineering plans met "applicable fire safety standards," alleged that he was improperly terminated for reporting that another employee had approved fire safety designs without actually reviewing them. 762 F.3d at 216–17. Nielson argued this was "part of a continuing effort to coverup [sic] the false approval of fire safety designs" and that he was fired "because of his complaints about, and opposition to, [his employer's] fraudulent business practices." Id. at 217–218. Affirming dismissal, the Second Circuit held that it was not

objectively reasonable for Neilson to believe that the activity he reported constituted a violation of law because the plaintiff did not allege that the falsified reports were required by federal law or even made public. Id. at 222. Merely stating that the company's "practice had the potential of exposing the company to extreme financial risk" and "thus constituted potential shareholder fraud" was "too tenuous" a connection to support a plausible claim of shareholder fraud. Id. at 223. The court explained that where "a complainant's complaint concerns such a trivial matter, in terms of its relationship to shareholder interests, . . . he or she did not engage in protected activity." Id. at 222 (quotation omitted).

McManus's PAC does not suffer from the same deficiencies. It may not be reasonable to believe that failure to observe internal fire safety policies amounts to securities fraud, but accounting fraud is a paradigmatic securities fraud violation. See id. at 223 (listing "perceived misconduct in . . . accounting practices" among examples of well-pleaded allegations of conduct that an employee might reasonably believe violates the securities laws). While the Nielson plaintiff offered "conclusory statement[s]" that his employer had engaged in mail and wire fraud or defrauded shareholders, id. at 222, McManus has presented factual allegations which, if true, plausibly state an objectively reasonable belief that Tetra Tech violated the securities laws.

Tetra Tech also relies on Diaz v. Transatlantic Reinsurance Co., No. 16-CV-1355, 2016 WL 3568071 (S.D.N.Y. June 22, 2016), where the plaintiff alleged that she believed her employer's conflicts, nepotism, and preferential treatment practices violated the securities laws. Id. at *2–3. The plaintiff also raised concerns about "the effect [officers' purported conflicts of interest] could have on [defendant's] shareholders' and 'on Defendant's reputation in the reinsurance industry.'" Id. at *3. The court rejected Diaz's belief that her employer had violated

the securities laws as objectively unreasonable because "[n]one of her statements to Defendant or [the] Compliance Departments involved providing false or fraudulent information to shareholders or the public" and she did not "allege any intent to deceive shareholders." Id. at *5. Not so here. McManus has clearly alleged that Tetra Tech provided fraudulent information to investors by delaying the reporting of losses, PAC ¶¶ 62–75, 83–85, and that it did so with an intent to deceive the public, id. ¶ 102.

Tetra Tech describes McManus's "theory of fraud [as] absurd on its face." Mem. at 13; see also Tetra Tech Opp'n at 6 ("As a theory of fraud, [McManus's allegation] is simply absurd."). As an example of this supposed absurdity, Tetra Tech points to McManus's allegation that delays in reporting losses created "a windfall for company executives in timing their exercises of stock options or earn-out bonuses." PAC ¶ 104. Tetra Tech argues that this allegation makes no sense because "the achievement of 'earn-out bonuses,' and the timing of the exercise of stock options, would benefit (or harm) two very different groups of people, whose economic interests would clash in [the scheme alleged]." Teta Tech Opp'n at 6–7. These two groups' interests "clash," according to Tetra Tech, because company executives would want to maximize losses to reduce the payment of earn-out bonuses. Id. at 7.[6] But McManus alleges that Tetra Tech executives were the recipients themselves of the earn-out bonuses, PAC ¶ 102.[7] Thus,

---

[6] Tetra Tech cites the definition of "earn-out" provided in NASDAQ's online Financial Glossary: "an additional payment in a merger or acquisition that is not part of the original acquisition cost, which is based on the acquired company's future earnings relative to a level determined by the merger agreement." Tetra Tech Opp'n at 7 n.8 (quoting Earn-Out Definition, NASDAQ Fin. Glossary, http://www.nasdaq.com/investing/glossary/e/earn-out).

[7] Some Tetra Tech executives may have been entitled to earn-out payments as a result of Tetra Tech Inc.'s 2007 acquisition of Delaney Construction. PAC ¶ 30. While it is unclear which Tetra Tech executives received earn-out bonuses or how these bonuses were structured, that is

McManus's theory of fraud is not premised on "clashing" interests. Executives exercising stock options and those receiving earn-out bonuses would both benefit from delaying losses because they would both want Tetra Tech to appear as profitable as possible when exercising options or calculating an earn-out. McManus's theory is not unlike the scheme alleged in <u>Berman</u>, where the plaintiff "allege[d] generally that [the defendant's] officers were committing accounting misconduct in order to inflate [the company's] apparent financial performance so that they could receive bonuses and hire more staff." 2016 WL 7975001, at *2. A jury may ultimately agree with Tetra Tech that McManus's belief was not reasonable, but it not for this Court to choose between completing explanations on a 12(b)(6) motion. <u>See</u> <u>Anderson News</u>, 680 F.3d at 185 (noting that a court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible" when presented with "two plausible inferences that may be drawn from factual allegations"). The question now is whether McManus has plausibly pleaded that he had an objectively reasonable belief that Tetra Tech had violated the securities laws. Having satisfied this burden, McManus's allegations are not subject to dismissal.

Tetra Tech also argues that McManus's belief was not objectively reasonable because he has failed to adequately plead the elements of a securities violation. His belief is unreasonable, Tetra Tech asserts, because "there is a world of difference between GAAP accounting errors and allegations which sufficiently allege fraud," Tetra Tech Opp'n at 11, the company's "financials for the 2014 year at issue have been audited by one of the Big Four accounting firms and have

---

not material at the motion-to-dismiss stage, where McManus is required to only offer "a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Twombly</u>, 550 U.S. at 573 (quoting Fed. R. Civ. P. 8(a)(2)).

not been restated," Mem. at 8–9, and "it is highly unlikely that [the improperly recognized losses] would be material to Tetra Tech's financials," id. at 15. A Dodd-Frank whistleblower "plaintiff is not required to prove that a securities law violation had occurred, but only that he possessed a good faith reasonable belief that such a violation had occurred." Williams v. Rosenblatt Sec. Inc., 136 F. Supp. 3d 593, 605 (S.D.N.Y. 2015). As explained above, McManus has met this burden because his allegations are plausible and similar to those upheld by other courts at the motion-to-dismiss stage. To the extent Tetra Tech argues that McManus unreasonably believed the company committed fraud because the company did not actually violate the securities laws, its argument is without merit.

### C. Motion to Amend

Rule 15 of the Federal Rules of Civil Procedure allows a plaintiff to amend his complaint more than twenty-one days after service of a motion to dismiss "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).[8] Courts "should freely give leave when justice so requires." Id. "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962). A motion to amend under Rule 15(a) "'should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." Aetna Cas. & Sur.

---

[8]  McManus sought Tetra Tech's consent to file an amended complaint on October 31, 2016. McManus's Mem. at 1. Tetra Tech declined to consent. Id.

Co. v. Aniero Concrete Co., 404 F.3d 566, 603–04 (2d Cir. 2005) (quoting Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987)); see also Dunn v. Albany Med. Coll., No. 09-CV-1031, 2010 WL 2326127, at *8 (N.D.N.Y. June 7, 2010) (Kahn, J.) ("Leave to amend a complaint is not automatic, and a court may deny a motion to amend for good cause 'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" (quoting Foman, 371 U.S. at 182)).

Tetra Tech argues that McManus's Motion to Amend should be denied on futility grounds because the changes proposed in the PAC do not address the purported deficiencies identified in Tetra Tech's motion to dismiss. Tetra Tech Opp'n at 1. "An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis." Cowles v. Yesford, No. 99-CV-2083, 2001 WL 179928, at *3 (N.D.N.Y. Feb. 22, 2001) (quoting Chan v. Reno, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996)). Because the Court has determined that the PAC adequately alleges a claim under § 78u-6, McManus's proposed amendments are not futile. Tetra Tech raises no other reasons why leave to amend should not be granted, and the Court is aware of none. The Court therefore finds that justice requires allowing McManus to amend his Complaint.

V.    **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Tetra Tech's Motion to Dismiss (Dkt. No. 17), is **DENIED**; and it is further

**ORDERED**, that McManus's Motion to Amend (Dkt. No. 21) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      May 11, 2017
                 Albany, New York

Lawrence E. Kahn
U.S. District Judge